UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ALFRED R. TORONKA, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. H-08-2582 |
| | § | |
| CONTINENTAL AIRLINES, INC., | § | |
| | § | |
| Defendant. | § | |

**OPINION AND ORDER**

Pending before the Court is Defendant Continental Airlines, Inc.'s ("CAL") motion for summary judgment (Doc. 24), as well as Plaintiff Alfred R. Toronka's ("Toronka") response (Doc. 25), and Defendant's reply (Doc. 26).   Upon careful review and consideration of this motion, the response and reply thereto, the relevant legal authority, and for the reasons explained below, the Court finds that Defendant's motion should be granted.


I.  Background and Relevant Facts

This is a wrongful termination case.  Toronka is a sixty-three-year-old African-American from Sierra Leone who immigrated to the United States approximately forty years ago. (Doc. 24-1 at 9.)  He has a bachelor's degree in business administration and a master's degree in political economy and economics.  (*Id.* at 14.)  Toronka identifies with Seventh Day Adventists and, for the past six years, has been affiliated with the Houston Central Seventh Day Adventist Church.  (*Id.* at 11.)  Toronka also expresses a belief in voodoo and the power of dreams, though he does not practice voodoo and has never been trained in voodoo.  (*Id.* at 8–9.)  Toronka says that his belief in voodoo has never caused him to take any particular action.  (*Id.*)  On one occasion, Toronka discussed a general belief in voodoo with a coworker.  (*Id.* at 9–10.)

In 1997, CAL hired Toronka as a material specialist in the Stores department at the Morales facility.  (*Id.* at 24.)  In June 2005, CAL moved the Morales Stores department to a new warehouse located at Bush Intercontinental Airport ("IAH").  (*Id.*)  The Stores department orders, ships, receives, warehouses, and delivers aircraft parts from the IAH warehouse to locations around the IAH campus.  (Doc. 24-3 at 3.)  As of November 24, 2009, the Stores department employed 112 people: 40 African-Americans, 41 Caucasians, and 31 employees that are either Hispanic or Asian.  (Doc. 24-2 at 3.)  Of the 112 employees, the IAH Stores department had 86 material specialists, 74 with greater seniority than Toronka.  (*Id.*)

Material Services and Aircraft Maintenance are the two groups that make up CAL's Technical Operations.  (*Id.* at 2.)  A material specialist is expected to work 40 hours per week during one of three shifts, with two days off.  (Doc. 24-3 at 3.)  An employee can take an unscheduled day off only if he can "day trade" his shift with another employee.  (*Id.*)  Day trading is purely voluntary, and employees must handle the process personally.  (*Id.*)  No employee is required to day trade, and CAL does not supervise day trading.  (*Id.*)

Every material specialist must be able to operate a forklift and other machinery, and handle hazardous materials.  (*Id.* at 3–5.)  These tasks are safety sensitive.  (*Id.*)  Removing any of these duties would create a new category of material specialist.  (*Id.*)  There are two material specialist positions that ostensibly do not require any safety sensitive tasks: inventory and logbook.  (*Id.* at 10.)  However, because order volumes are unpredictable, CAL requires that each employee be able to perform any of the safety sensitive tasks at any given time.  (*Id.* at 4.)  Also, inventory is not a permanent position on every shift.  (*Id.* at 10.)

A biannual bidding system awards job openings, shifts, and days off by seniority according to the Stores Employment Policy ("SEP").  (*Id.*)  Because of his seniority level,

Toronka could not bid on the first shift.  (Doc. 24-3 at 2–3.)  The SEP is a non-collectively bargained agreement between CAL and the Stores department employees containing information regarding pay rates, attendance policies, promotions, absences, benefits, and appeals procedures. (Doc. 24-2 at 3.)  CAL provides each employee with a copy of the SEP.  (*Id.*)

In addition to the SEP, CAL issued the Working Together Guidelines ("WTG"), an employee manual setting forth general employment policy.  (*Id.* at 3–4.)  The WTG applies where a specific work division has not established specific rules to the contrary.  (*Id.*)  If contrary work rules exist, then the more specific rules trump the WTG.  (*Id.*)  The WTG also contains disciplinary procedures called the Performance Improvement Process ("PIP") for resolving performance problems.  (*Id.*)  The PIP recommends termination of employees who are involved in severe performance incidents.  (*Id.*)  The lesser sanction for a performance incident is a suspension without pay.  (*Id.*)

CAL's Employee Assistance Program ("EAP") is also part of the WTG.  (*Id.* at 4–5.) The EAP has two goals: (1) provide assessment, referral, follow-up, and monitoring of employees who experience personal problems and (2) assist management in assessing an employee's mental health in regards to his fitness for certain duties.  (*Id.* at 12.)  CAL can issue a mandatory EAP referral based on unsatisfactory job performance or behavior.  (*Id.*)

If CAL requires an employee to participate in the EAP, then that employee must comply with all required referrals for diagnosis, treatment, and monitoring to manage or resolve the mental health or personal issue.  (*Id.*)  As required by law, EAP evaluations are independent and confidential.  (*Id.* at 5.)  Neither human resources nor any operational department, like Stores, has any input regarding treatment.  (*Id.*)  The only issues that do not remain confidential are whether the employee keeps the appointment and complies with the EAP referral and evaluation.

(*Id.* at 12.)  Supervisors also receive the final assessment of an employee's fitness for work.  (*Id.* at 5.)  Between 2002 and 2007, twenty-nine people in Technical Operations were issued mandatory EAP referrals, among which were Caucasians, African-Americans, and Hispanics. (*Id.*)

On February 5, 2003, Toronka was given a written warning following a serious safety violation for mishandling hazardous materials, resulting in mandatory participation in a four-day training program and a warning that a "[f]uture violation will result in an increase[d] degree of disciplinary action, up to and including termination."  (Doc. 24-3 at 13.)

On October 12, 2007, Toronka crashed a CAL van into the avionics department at IAH. (*Id.* at 4.)  Eyewitnesses testified that, while delivering a part from the warehouse to the avionics department, Toronka rounded the corner by Gate 45 at high speed.  (Doc. 24-3 at 5; Doc. 24-4 at 3–4.)  Toronka grazed an aircraft tug and crashed through the front wall of the avionics department.  (*Id.*)  Five employees suffered multiple injuries: broken bones, scrapes, contusions, and other back, leg, hip, and shoulder injuries.  (Doc. 24-3 at 5, 15–20.)  An ambulance took Toronka and two other employees to the hospital.  (*Id.* at 5.)  At the hospital, Toronka took and passed a drug test.  (*Id.* at 6.)  The Houston Police Department ("HPD") issued Toronka a speeding ticket.  (*Id.*)  One employee testified that the incident was the worst accident in his twenty years on the job.  (*Id.*)  When the police released the van that Toronka was driving, an inspection indicated that the van did not experience mechanical failure, contrary to Toronka's assertion that the accelerator pedal had gotten stuck.  (*Id.* at 23.)

On November 1, 2007, James Farrell ("Farrell"), Regional Manager of Human Resources for Technical Operations, Dave Kapinos ("Kapinos"), Senior Manager of Stores, Judge Caston, Stores Supervisor, and George Carson, a representative from the Material Services Council who

represented Toronka, convened a meeting to inform Toronka of the outcome of a fact-finding investigation.  (Doc. 24-2 at 5.)  Toronka offered no explanation other than the faulty accelerator pedal and that the accident had been inevitable based on a dream his wife had before the accident.  (Doc. 24-6 at 3.)  CAL's investigation concluded that Toronka was at fault.  (*Id.*)  Kapinos thought the accident was serious enough to warrant immediate termination.  (*Id.*)  Considering Toronka's work history and length of service, however, Kapinos gave Toronka an opportunity to keep his job subject to a two-week disciplinary suspension and a mandatory EAP referral.  (*Id.*)  In the fact-finding report, which Toronka signed, Toronka was notified that, if he did not accept these terms, his employment would be terminated.  (*Id.* at 4.)

As part of the EAP process, an independent psychiatrist, psychologist, and neurologist evaluated Toronka.  All physicians were independent and unaffiliated with CAL.  (Doc 24-2 at 9.)  Dr. George S. Glass, a psychiatrist, evaluated Toronka first.  (Doc 24-7 at 2.)  Dr. Glass' report of November 13, 2007, indicated that Toronka still insisted that his wife's dream had made the accident inevitable.  (*Id.*)  Toronka also suggested that his ex-wife may have cast evil voodoo spells on him.  (*Id.*)  Dr. Glass could not comment on whether Toronka's belief in voodoo was a delusion, hallucination, or sincere religious belief.  (*Id.* at 3.)  Dr. Glass recommended that Toronka undergo a thorough psychological evaluation to determine whether he was competent to return to work.  (*Id.*)

Per Dr. Glass' recommendation, Dr. Arthur Tarbox, a clinical psychologist, evaluated Toronka.  On November 29, 2007, Dr. Tarbox reported that Toronka suffered severely impaired cognitive functioning, moderately impaired verbal logic and abstract reasoning, severely impaired ability to attend to visual stimuli, a below average ability to attend to complex verbal stimuli, severely impaired rote memorization ability, and severely impaired judgment and

reasoning on demanding tasks.  (Doc. 24-8 at 5–6.)  Dr. Tarbox also found that Toronka's motor

and language skills were moderately impaired.  (*Id.* at 6.)  Dr. Tarbox was unable to rule out

dementia and suggested that Toronka have a neurological consultation.  (*Id.* at 7.)  Though he

could not state whether Toronka was fit for duty from a neuropsychological standpoint, Dr.

Tarbox had serious concerns about Toronka's ability to do jobs requiring the operation of a

motor vehicle.  (*Id.*)

Dr. Randolph Evans, a neurologist, then evaluated Toronka.  Dr. Evans recommended

that Toronka not drive and that he go to the Texas Department of Public Safety for a formal

driving test and evaluation.  (Doc. 24-9 at 3.)  Dr. Evans then referred Toronka back to Dr. Glass

to determine whether Toronka could return to work.  (*Id.*)  Dr. Glass' final report indicated that

Toronka should not work in his previous capacity because he was not fit for duty in safety

sensitive areas.  (Doc. 24-10 at 2.)  Dr. Glass was optimistic regarding Toronka's ability to work

in another capacity at CAL.  (*Id.*)  Dr. Glass further noted that Dr. Evans suggested Toronka take

an Alzheimer's medication and Dr. Tarbox suggested an antidepressant.  (*Id.* at 3.)

On February 1, 2008, Farrell and Kapinos advised Toronka that he could no longer work

as a material specialist because he was restricted from all safety sensitive positions.  (Doc. 24-2

at 6, Doc. 24-3 at 7.)  Farrell and Kapinos met with Toronka on at least three occasions in 2008

and 2009 to discuss other opportunities at CAL not involving safety sensitive tasks.  Specifically,

they suggested that Toronka apply for jobs as a Buyer, Records Coordinator, Senior Buyer,

Senior Records Coordinator, or Senior Planner.  (Doc. 24-2 at 6.)  Kapinos offered assistance

and his recommendation, but Toronka did not express any interest and did not pursue any of the

suggestions.  (Doc. 24-3 at 7.)  Farrell also offered to help Toronka by providing a

recommendation and helping him fill out applications.  (Doc. 24-2 at 7.)  CAL's records indicate

6 / 17

that Toronka did not apply for any of the 584 job openings posted between January 1, 2008 and June 1, 2009.  (*Id.* at 6–7.)

On August 15, 2008, Dr. David Schwartz, Toronka's physician, sent a brief letter to CAL's human resources department on Toronka's behalf.  (Doc. 24-11 at 2.)  The letter said that Dr. Schwartz gave Toronka a physical examination and that, in his opinion, Toronka was physically and mentally able to drive. (*Id.*)  EAP then arranged yet another independent evaluation with another Houston psychiatrist, Dr. Michael Pipkin.  (Doc. 24 at 14, ¶ 41.)  Dr. Pipkin issued a report on November 7, 2008 that concluded, "Mr. Toronka should not be returned to work until a repeat neuropsychological evaluation demonstrates improvement of the cognitive impairment previously documented."  (Doc. 24-12 at 4.)

Toronka then contacted Dr. Ifeoma Arena, who performed a psychiatric evaluation on March 17, 2009.  (Doc. 24-13 at 2.)  That evaluation, however, was not the neuropsychological evaluation that Dr. Pipkin recommended.  (*Id.*)  Though Dr. Arena saw no reason that Toronka should not return to the job he "performed well on for twelve years," the report indicates that Toronka downplayed the accident.  (*Id.* at 2, 4.)  Regarding the accident, Dr. Arena wrote, "[p]atient reports there was some moderate physical damage and that another individual got slightly injured." (*Id.* at 2.)

Nevertheless, EAP sent Toronka to still another independent physician, Dr. Carlos Porges, for a follow-up neuropsychological evaluation.  (Doc. 24 at 15, ¶ 43.)  Dr. Porges concluded that Toronka suffered from marked cognitive deficits, including difficulty in recognizing a problem and devising and implementing problem-solving strategies.  (Doc. 24-14 at 6.)  Dr. Porges also found that Toronka had difficulty learning and remembering and was unaware of these difficulties.  (*Id.*)  Dr. Porges did find that Toronka had relatively strong verbal

skills, but concluded that those skills could lead a casual observer to think that he was functioning at a higher level than was actually the case.  (*Id.* at 6–7.)  Dr. Porges concluded that it was not safe for Toronka to drive and did not think that Toronka could return to work.  (*Id.* at 7.)  He also recommended that Toronka have a repeat neurological evaluation.  (*Id.*)

Plaintiff Toronka filed suit on August 25, 2008, alleging discrimination based on his race, color, national origin, and religion.  (Doc. 1.)  Toronka also alleges that CAL did not accommodate his disability in violation of the Americans with Disability Act.  (*Id.*)  Toronka seeks actual damages, as well as attorney's fees and costs, and reinstatement to his previously held position.  (*Id.*)  Defendant CAL now moves for summary judgment.  (Doc. 24.)


II.  Summary Judgment Standard

A party moving for summary judgment must inform the court of the basis for the motion and identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The substantive law governing the suit identifies the essential elements of the claims at issue and therefore indicates which facts are material.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The initial burden falls on the movant to identify areas essential to the nonmovant's claim in which there is an "absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005). If the moving party fails to meet its initial burden, the motion must be denied, regardless of the adequacy of any response.  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*).  Moreover, if the party moving for summary judgment bears the

burden of proof on an issue, either as a plaintiff or as a defendant asserting an affirmative defense, then that party must establish that no dispute of material fact exists regarding all of the essential elements of the claim or defense to warrant judgment in his favor. *Fontenot v. Upjohn*, 780 F.2d 1190, 1194 (5th Cir. 1986) (the movant with the burden of proof "must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor" (emphasis in original)).

Once the movant meets its burden, the nonmovant must direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 323–24. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indust. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citing *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). Instead, the non-moving party must produce evidence upon which a jury could reasonably base a verdict in its favor. *Anderson*, 477 U.S. at 248; *see also DIRECTV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005). To do so, the nonmovant must "go beyond the pleadings and by [its] own affidavits or by depositions, answers to interrogatories and admissions on file, designate specific facts that show there is a genuine issue for trial." W*ebb v. Cardiothoracic Surgery Assoc. of N. Tex., P.A.*, 139 F.3d 532, 536 (5th Cir. 1998). Unsubstantiated and subjective beliefs and conclusory allegations and opinions of fact are not competent summary judgment evidence. *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998); *Grimes v. Tex. Dept. of Mental Health and Mental Retardation*, 102 F.3d 137, 139–40 (5th Cir. 1996); *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994), *cert. denied*, 513 U.S. 871 (1994); *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (1992), *cert. denied*, 506 U.S. 825 (1992). Nor are pleadings summary judgment evidence. *Wallace v. Tex. Tech Univ.*,

80 F.3d 1042, 1046 (5th Cir. 1996) (citing *Little*, 37 F.3d at 1075).

The nonmovant cannot discharge his burden by offering vague allegations and legal conclusions. *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990). Nor is the court required by Rule 56 to sift through the record in search of evidence to support a party's opposition to summary judgment. *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16 & n.7 (5th Cir. 1992)). Nevertheless, all reasonable inferences must be drawn in favor of the nonmoving party. *Matsushita*, 475 U.S. at 587–88; *see also, Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003). The party opposing a motion for summary judgment does not need to present additional evidence, but may identify genuine issues of fact extant in the summary judgment evidence produced by the moving party. *Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 198–200 (5th Cir. 1988). The nonmoving party may also identify evidentiary documents already in the record that establish specific facts showing the existence of a genuine issue. *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990).


## III. Discussion

### A. Title VII

It is unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Without direct evidence of discrimination, a plaintiff can rely on circumstantial evidence. *Rutherford v. Harris County, Tex.*, 197 F.3d 173,

180 n.4 (5th Cir. 1999) (citing *Rhodes v. Guiberson Oil Tools*, 75 F.3d 989, 993 (5th Cir. 1996)). The court analyzes such claims under the burden-shifting framework outlined in *McDonnell Douglas v. Green*. 411 U.S. 792 (1973); *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 316 (5th Cir. 2004). The initial burden lies with the plaintiff to plead a *prima facie* case of employment discrimination. *Davis*, 383 F.3d at 316. This burden is one of production and not of persuasion. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000).

To establish a *prima facie* case, the plaintiff must show the following: (1) he was a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was replaced by someone outside the protected class, or, in the case of disparate treatment, similarly-situated employees outside the protected class were treated more favorably. *See Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 512–13 (5th Cir. 2001) (citing *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 (5th Cir. 1999); *Rutherford*, 197 F.3d at 184; *Davin v. Delta Air Lines, Inc.*, 678 F.2d 567, 570 (5th Cir. 1982)). Similarly situated means that a plaintiff must show that the supposed misconduct of both employees was "nearly identical." *Dodge v. Hertz Corp.*, 124 F. App'x 242, 244 (5th Cir. 2005) (quoting *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 221 (5th Cir. 2001)).

The court also uses the burden-shifting framework to evaluate a plaintiff's claim of disparate treatment based on religion. *Bouie v. Equistar Chemicals LP*, 188 F. App'x. 233, 236 (5th Cir. 2006). A religious belief is a deeply held conviction shared by an organized group and intimately related to daily living. *Wisconsin v. Yoder*, 406 U.S. 205, 216 (1972). Moreover, a *bona fide* religious belief is based on a theory of "man's nature or his place in the Universe." *Brown v. Dade Christian Schools, Inc.*, 556 F.2d 310, 324 (5th Cir. 1977) (Roney, J., dissenting). This definition excludes personal preferences based on political, sociological, and economic

considerations, or personal moral codes. *U.S. v. Seeger,* 380 U.S. 163, 172 (1965).  Analysis of the religious nature of a belief does not turn on the veracity of that belief.  *See Brown v. Resor*, 407 F.2d 281, 288 (5th Cir. 1969).  Rather, the focus is whether a belief is sincere and, in the person's own scheme of things, religious. *Theriault v. Carlson*, 495 F.2d 390, 394 (5th Cir. 1974).  In that regard, sincerely held personal beliefs that an individual describes as religious may be protected. *Id.*  There is, however, a rational limit to what courts are willing to accept. *See, e.g., Brown v. Pena*, 441 F. Supp. 1382, 1385 (S.D. Fla. 1977) (finding plaintiff's "personal religious creed" of eating Kozy Kitten cat food was a personal preference, not a religious belief).

If the plaintiff establishes a *prima facie* case of discrimination, a presumption of discrimination arises, and the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its employment action. *Price v. Fed. Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002) (citing *McDonnell Douglas*, 411 U.S. at 802).  The defendant's burden is satisfied if he produces evidence that "*taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action." *Id.* (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993)) (emphasis in original).  If the defendant articulates a reason that can support a finding that its actions were nondiscriminatory, "the mandatory inference of discrimination created by the plaintiff's *prima facie* case drops out." *Id.* (citing *Hicks*, 509 U.S. at 510–11).  In order to survive summary judgment, the plaintiff must then introduce evidence showing either that (1) defendant's articulated reason was pretextual, or that (2) plaintiff's protected characteristic was a motivating factor in the decision. *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004) (citing *Rishel v. Nationwide Mut. Ins. Co.*, 297 F. Supp. 2d 854, 865 (M.D.N.C. 2003)).  A plaintiff's bare assertion of satisfactory job performance is insufficient to show that a defendant's actions were pretextual. *Mire v. Texas Plumbing Supply*

*Co., Inc.*, 286 F. App'x. 138, 144 (5th Cir. 2008) (citing *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 354–55 (5th Cir. 2005)).

Although the intermediate evidentiary burdens shift back and forth, the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves*, 530 U.S. at 143 (quoting *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).   In determining whether summary judgment is appropriate, the court considers the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence supporting the employer's case that may properly be considered for summary judgment. *Id*. at 148–49.

Toronka claims that CAL suspended him for 14 days and mandated an EAP referral because of his race or national origin, while giving other employees involved in accidents shorter suspensions and not mandating EAP referrals.   To establish a *prima facie* case for disparate treatment on the basis of race or national origin, Toronka must show that CAL treated similarly-situated employees outside the protected class of African-Americans or Sierra Leoneans more favorably. *See Okoye*, 245 F.3d at 512–13.   Toronka names Elett Mercado, Chris Zirzle, Carlos Salazar, Angel Mendez, and Steve Alexa as similarly-situated employees who were treated more favorably. (Doc. 24-1 at 63–73; Doc. 24-3 at 8–10.)  Ms. Mercado did have an accident, but she was neither issued a citation nor found to be at fault. (Doc. 24-3 at 8.)  Mr. Zirzle also had an accident and was not issued a citation nor found to be at fault. (*Id.* at 9–10.)  CAL has no records of accidents involving Mr. Salazar or Mr. Mendez. (*Id.* at 8.)  Finally, Mr. Alexa was in an accident that resulted in property damage, but CAL was unable to assign fault because there were no witnesses or videotape of the incident. (*Id.*)  These employees are not sufficiently similar because none of them was responsible for an accident resulting in major bodily injuries. *Dodge*,

124 F. App'x at 244 (holding that similarly situated means that the supposed misconduct of both employees must be nearly identical).  Without evidence of a sufficiently similar comparator, Toronka cannot establish a *prima facie* case.

Regarding Toronka's claim of disparate treatment based on religion, there is no evidence that any CAL supervisor knew that Toronka was a Seventh Day Adventist or that he believed in voodoo or the power of dreams prior to the disciplinary actions.  (Doc. 24-1 at 10, 18, 22.)  Though Toronka claimed that the accident was inevitable due to his wife's dream during the investigation, CAL did not understand that statement as an indication of Toronka's religious belief.  (Doc. 24-2 at 5; Doc. 24-3 at 6.)  Without knowledge of his religious affiliations, CAL could not have taken disciplinary actions against Toronka on that basis.  Even assuming, *arguendo,* that CAL knew of his beliefs before the disciplinary actions, Toronka still identifies no similarly situated comparator who was treated more favorably.  Without evidence of nearly identical comparators, Toronka cannot establish a *prima facie* case.

### B.  Disability Discrimination under the ADA

The ADA prohibits discrimination against a qualified individual on the basis of disability. 42 U.S.C. § 12112(a).  A disability is a physical or mental impairment that substantially limits a major life activity.  42 U.S.C. § 1202(1)(A).  Working is a major life activity.  42 U.S.C. § 1202(2)(A).  Discrimination may include a failure to reasonably accommodate the known physical or mental disability of an otherwise qualified employee, unless the employer can demonstrate the accommodation would impose an undue hardship on the business.  42 U.S.C. § 12112(b)(5)(A).  To prevail on an ADA claim, a plaintiff must prove that (1) he has a disability; (2) he is qualified, and (3) he suffered an adverse employment decision solely because of his disability.  *Cooper v. United Parcel Serv., Inc.*,  Civ. No. 09-30865, 2010 WL 610047, at

*5 (5th Cir. 2010) (quoting *Turco v. Hoechst Calanese Corp.*, 101 F.3d 1090, 1092 (5th Cir. 1997) (*per curiam*)).

To qualify for protection, the plaintiff must be an individual with a disability who, with reasonable accommodation, can perform the essential functions of the employment position that plaintiff holds or desires.  *Id.* at *6 (citing 42 U.S.C. § 12111(8)).  Reasonable accommodations may include job restructuring, part-time or modified work schedules, or reassignment to a vacant position.  *Id.* (citing 29 C.F.R. § 1630.2(a)(2)(ii)).  The ADA, however, does not require an employer to eliminate essential job functions, modify job duties, reassign existing employees, or hire new employees.  *Id.*  (citing *Burch v. City of Nacogdoches*, 174 F.3d 615, 621 (5th Cir. 1999)).  Moreover, the employer is not required to undermine an established seniority system.  *U.S. Airways, Inc. v Barnett*, 535 U.S. 391, 405 (2002).  The plaintiff bears the burden of proving that the employer failed to implement a reasonable accommodation.  *Riel v. Electronic Data Sys. Corp.*, 99 F.3d 678, 682 (5th Cir. 1996).

Construing all facts and making all inferences in Toronka's favor, the Court will assume that Toronka has an actual disability that prevents him from doing any safety-sensitive task.  Nonetheless, Toronka fails to show that CAL did not provide reasonable accommodations that would enable him to perform the essential job functions of a material specialist.  Toronka sought any one of three accommodations: (1) permanent assignment to logbook, (2) permanent inventory assignment, (3) or assignment to any Stores department that does not require driving.  (Doc. 25-2 at 8.)  These requested accommodations are not reasonable.

First, assigning Toronka to logbook permanently eliminates essential job functions of a material specialist.  There are seven basic duties of every material specialist on second shift: Z-Runner, Utility, Outbound, Inbound, Puller, Logbook, and Window.  (Doc. 24-3 at 3.)  Toronka

admits that each position, except logbook, requires driving and operating equipment.  (Doc. 25 at 10–11.)  Toronka also acknowledges that an employee working logbook may be asked to drive.  (*Id.*)  Toronka's admissions are consistent with Kapinos' testimony that the material specialist position is a safety-sensitive job requiring flexibility.  (Doc. 24-3 at 4.)  Assigning Toronka to a permanent position on logbook that is immune from a material specialists' flexibility requirement would essentially create a new, lighter duty position.   Such accommodations are unreasonable.  *Burch* 174 F.3d at 621 (holding that "the ADA does not require an employer to create a new job category for the disabled worker or to adjust co-workers' duties to make them work longer or harder.").  Toronka then asserts that CAL allowed other employees exclusive logbook assignments.  (Doc. 25 at 30–31.)  Toronka, however, offers no evidence that CAL ever created a permanent, long-term logbook job for anyone.  As such, Toronka fails to show that this proposed accommodation is reasonable.  *See Burch* 174 F.3d at 621.

Next, Toronka suggests that CAL should accommodate him with a permanent inventory assignment.  That job, however, is only available to first shift employees and awarded by seniority.  (Doc. 24-3 at 10.)  Allowing Toronka to bid on that job is an unreasonable accommodation because it would disrupt a *bona fide* seniority system.  *U.S. Airways,* 535 U.S. at 405.  Toronka argues that CAL could easily move the inventory assignment to the second shift. (Doc. 25 at 31.)  To move inventory to the second shift, however, CAL would need either to hire another inventory supervisor or to transfer more responsibility to existing supervisors.  (Doc. 23 at 10.)  The ADA, however, does not require the creation of new positions or the assignment of additional duties to current employees.  *Burch,* 174 F.3d at 621.

Toronka's third suggestion is that CAL move him to another department such as binning,

kitting, shipping, or receiving, because that would eliminate the need for him to drive.  Those positions, however, also require the safety-sensitive task of operating heavy machinery.  (Doc. 23 at 3–4.)  Toronka concedes, however, that "his impairment significantly restricts his ability to perform . . . critical or safety sensitive [jobs]."  (Doc. 25 at 27.)  As such, Toronka cannot establish that this is a reasonable accommodation.

Because Toronka cannot show that CAL can provide reasonable accommodations that would enable him to perform the essential duties of a material specialist, he is unable to establish a *prima facie* case of disability discrimination under the ADA.  It is worth noting that CAL encouraged Toronka to find another position within the company and offered to provide him with recommendations and assistance, even though he could have been immediately terminated after the accident.  (Doc. 24-2 at 6–7; Doc. 24-3 at 7.)  In that regard, CAL did provide accommodations.

IV.  Conclusion

Accordingly, the Court hereby ORDERS that Continental Airlines, Inc.'s motion for summary judgment (Doc. 24) is GRANTED.

SIGNED at Houston, Texas, this 3rd day of August, 2010.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE